# EXHIBIT 1

STATE OF NEW YORK
SUPREME COURT   :   COUNTY OF ERIE
------------------------------------------

DANIEL WILLIAMS and
EDWARD WILLIAMS,
13 Girard Place
Buffalo, New York  14211,

                          Plaintiffs,

      -vs-                                    **SUMMONS**
                                     Index No I 2005-007056

BEEMILLER, INC. d/b/a HI-POINT
4251 Flowers Road
Mansfield, Ohio  44903,

CHARLES BROWN
3332 Sea Turtle Drive
Dayton, Ohio  45414,

MKS SUPPLY, INC.
8611 N. Dixie Road
Dayton, Ohio  45414,

INTERNATIONAL GUN-A-RAMA
P.O. Box 5
Mt. Washington, Kentucky  40047,

KIMBERLY UPSHAW
5513 Wood Creek Road, #D1
Dayton, Ohio  45426,

JAMES NIGEL BOSTIC
191 Orleans Street
Buffalo, New York  14215,

CORNELL CALDWELL
Greene Correctional Facility
P. O. Box 8
Coxsackie, New York 12051-0008

and

JOHN DOE TRAFFICKERS 1-10,

                          Defendants.
------------------------------------------

FILED
JUL 2 8 2005

TO THE ABOVE-NAMED DEFENDANTS:

YOU ARE HEREBY SUMMONED and required to serve upon the plaintiffs' attorneys at their address stated below, an answer to the attached complaint.

If this summons was personally delivered to you in the State of New York, the answer must be served within twenty (20) days after such service of the summons, excluding the date of service.  If the summons was not personally delivered to you within the State of New York, the answer must be served within thirty (30) days after service of the summons is complete as provided by law.

If you do not serve an answer to the attached complaint within the applicable time limitation stated above, a judgment will be entered against you, by default, for the relief demanded in the complaint, without further notice to you.

The plaintiffs designate Erie County as the place of trial; the basis of venue is the residence of plaintiffs which is 13 Girard Place, Buffalo, New York, 14211.

This summons was filed on the date shown on the face of the summons with the Clerk of the Court in which this action is brought and assigned the Index Number on the face of the Summons.


DATED:   Buffalo, New York
         July 28, 2005


Terrence M. Connors
CONNORS & VILARDO, LLP
Attorneys for Plaintiffs
1020 Liberty Building,
420 Main Street
Buffalo, New York  14202
(716) 852-5533


-2-

STATE OF NEW YORK
SUPREME COURT   :   COUNTY OF ERIE
------------------------------------------

DANIEL WILLIAMS,
and EDWARD WILLIAMS,

                Plaintiffs,

   -vs-

                              **COMPLAINT**
                       Index No *I* 2005-*007056*

BEEMILLER, INC. d/b/a HI-POINT,
CHARLES BROWN,
MKS SUPPLY, INC.,
INTERNATIONAL GUN-A-RAMA,
KIMBERLY UPSHAW,
JAMES NIGEL BOSTIC,
CORNELL CALDWELL, and
JOHN DOE TRAFFICKERS 1-10,

                Defendants.
------------------------------------------

        Plaintiffs Edward Williams and Daniel Williams, by

the undersigned counsel, hereby allege upon information and

belief as follows:

### Summary of the Action

        1.   This is a civil action arising from the

shooting of Daniel Williams on August 16, 2003, in Buffalo.

        2.   Daniel was a rising junior at McKinley High

School in Buffalo.  He was a student athlete who was a

highly-touted college basketball prospect.  At the time he

was shot, Daniel was playing basketball in front of a

neighbor's house.

3.   The shooter, defendant Cornell Caldwell, was a gang member who shot Daniel in a drive-by shooting after he misidentified Daniel.

4.   The gun, a Hi-Point 9mm semi-automatic pistol, bore serial number 502139 (hereinafter the "Hi-Point handgun"). It is a "Saturday night special": an inexpensive, low quality, easily concealable gun that has little or no sporting value or utility.

5.   Like thousands before it, the Hi-Point handgun was manufactured by defendant Beemiller, Inc., and distributed to defendant MKS Supply, Inc. MKS Supply, Inc., is the sole distributor of Hi-Point firearms. MKS Supply, Inc., does not sell or distribute any brand of firearms other than Hi-Point firearms. The President of MKS Supply, Inc., Defendant Charles Brown, sold the Hi-Point handgun at an Ohio gun show operated by defendant International Gun-A-Rama to defendant James Nigel Bostic and Bostic's "straw purchaser," defendant Kimberly Upshaw.

6.   Bostic and Upshaw purchased over 140 handguns from Brown in addition to the gun that was used to shoot Daniel Williams. On the day Bostic and Upshaw bought the Hi-Point handgun from Brown, they bought 87 handguns from him. Bostic is a convict with an extensive criminal record.

-2-

Bostic paid with cash for the guns, including the gun used in the Williams shooting.

7. Bostic took these guns and distributed them in an illegal gun trafficking scheme that placed them on the streets of Buffalo.

8. The United States Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") traces handguns used in crimes. It contacts each entity involved in the sale of each such handgun, from manufacturer through distributor until reaching the dealer who made the retail sale of the handgun.

9. Defendants Beemiller, Inc.; Brown; and MKS Supply, Inc. (hereinafter, collectively, "defendant gun sellers") thus received specific notice from the ATF each time a gun it sold was used in a crime.

10. The Hi-Point 9mm semi-automatic pistol was the most popular pistol used in crimes in Buffalo in 2000.

11. In the twelve years leading up to the sale of the Hi-Point handgun to Bostic (from 1988 to 2000), the ATF gave Beemiller, Inc. and MKS Sales, Inc. notice that over ten thousand guns they sold were used in crimes. This notice represented only those guns that the ATF was able to

-3-

successfully trace following a gun crime.  It did not
include guns that could not be traced.

12.  Notwithstanding this notice of over ten
thousand of their guns used in crimes, and notwithstanding
the fact that the defendants were aware that the
circumstances of the prior sales of these guns had resulted
in countless tragic shootings like the shooting of Daniel
Williams, the defendants persisted in making these guns
available to criminals who the defendants knew or should
have known were using them in crimes.

13.  Daniel Williams and his father, Edward, bring
this suit to hold these corporations and individuals
accountable for the wrongful actions that caused their
injuries.

## Parties

14.  Plaintiff Daniel Williams is and was at all
times relevant hereto a resident of the City of Buffalo, New
York.

15.  Plaintiff Edward Williams is and was at all
times relevant hereto a resident of the City of Buffalo, New
York, and parent and natural guardian of Daniel Williams.

-4-

16. Defendant Beemiller, Inc. is a corporation organized and existing under the laws of the State of Ohio with its principal place of business at 4251 Flowers Rd., Mansfield Ohio, 44903.

17. Beemiller, Inc. manufactures and sells handguns sold in New York.

18. Beemiller, Inc. manufactured and sold the handgun used to shoot and injure Daniel.

19. Defendant MKS Supply, Inc. is a corporation organized and existing under the laws of the State of Ohio with it principal place of business at 8611 N. Dixie Rd., Dayton, Ohio 45414.

20. MKS Supply, Inc. distributed the Hi-Point handgun to Charles Brown.

21. MKS Supply, Inc. has sold at least 630 handguns traced to crime in the State of New York.

22. Many of these handguns were sold to New York residents for use in New York.

23. MKS Supply, Inc. deals directly to over 35 New York dealers.

24. Defendant Charles Brown is a federal firearms licensee at 3332 Sea Turtle Drive, Dayton, Ohio 45414.

-5-

Brown is licensed and engaged in the business of selling and distributing handguns.

25.   Charles Brown sold the Hi-Point handgun used to shoot and injure Daniel.

26.   Brown has sold at least 630 handguns traced to crime in the State of New York.

27.   Many of these handguns were sold to New York residents for use in New York.

28.   Brown is also the President of MKS Supply, Inc.

29.   Using his personal federal firearms license, Brown took guns from MKS Supply, Inc.'s inventory and sold them to consumers, including to Upshaw and Bostic, at the Hara Arena gun show in Dayton, Ohio.

30.   Defendant International Gun-A-Rama is a Kentucky corporation with its principal place of business in Mt. Washington, Kentucky 40047.

31.   International Gun-A-Rama owns "Bill Goodman's North American Gun & Knife Show" which operated in Hara Arena in Dayton, Ohio.

32.   This gun show is where Brown sold Bostic and Upshaw the Hi-Point handgun, as well as dozens of other handguns in 2000.

-6-

33.   Operators at International Gun-A-Rama have sold guns to New York residents for use in New York.

34.   Defendant James Nigel Bostic was at all times relevant a resident of Buffalo, New York.

35.   A convict with an extensive criminal record in New York, Bostic set up a trafficking scheme where he traveled to Ohio, a state with lax gun control laws, using straw purchasers to purchase large numbers of handguns, then sold the guns in New York at a profit.

36.   Bostic illegally obtained handguns -- including the Hi-Point handgun used to shoot and injure Daniel -- in this way, and then illegally transferred the handguns to other illegal traffickers or users.

37.   Bostic was convicted of gun trafficking and sentenced to seven years in prison in 2004.  He is currently serving his sentence at the U.S. Penitentiary in Lewisburg, Pennsylvania.

38.   Defendant Kimberly Upshaw was at all times relevant a resident of Dayton, Ohio.

39.   Kimberly Upshaw made straw purchases for Bostic from Defendant Charles Brown on at least four different occasions, including a straw purchase of the Hi-Point handgun, which was intended for use by a prohibited

-7-

buyer and ultimately was used to shoot and injure Daniel Williams.

40.   Upshaw was convicted of a misdemeanor and sentenced to two years probation and a $1000 fine.

41.   Defendant Cornell Caldwell was a gang member who shot Daniel Williams on August 16, 2003.

42.   Caldwell pled guilty to first-degree assault and was sentenced to six years in prison at Greene Correctional Facility in Coxsackie, New York, where he currently resides.

43.   Defendants John Doe Traffickers 1-10, inclusive, are persons whose identities are currently unknown.  Does 1-10 trafficked the Hi-Point handgun used to shoot and injure Daniel.  Plaintiffs are not aware of the true names of Does 1-10.  Plaintiffs allege that each of the fictitiously named defendants is responsible in some manner for the violations alleged herein.  Plaintiffs will seek leave to amend this Complaint to allege such names and capacities as soon as they are ascertained.

## Jurisdiction

44.    This Court possesses jurisdiction over this action pursuant to CPLR 301 and 302(a).

## Venue

45.    Venue is appropriate in Erie County, New York because the plaintiffs reside in Erie County, New York.

## Factual Allegations

The following allegations are made on the best information and belief of the Plaintiffs:

## A.    The Shooting of Daniel Williams.

46.    On August 16, 2003, Daniel Williams was shot in the abdomen.

47.    The bullet ripped through Daniel's stomach, knocking him to the ground.

48.    Daniel crawled for help until a neighbor stanched the bleeding and paramedics arrived.

49.    Daniel took months to recover.

50. Daniel required 22 staples to close the wound and could barely walk when he was released from the hospital.

51. The shooter's car fled the scene after Daniel was shot, but the car was located by police within minutes, whereafter the shooter was chased by officers and apprehended.

52. The shooter was known gang-member Cornell Caldwell.

53. Caldwell had shot Daniel mistakenly.

54. On the floor of Caldwell's car, police recovered a Hi-Point 9mm semi-automatic pistol, serial number 502139.

55. Daniel was shot with the Hi-Point handgun.

56. Caldwell pled guilty to first-degree assault and was sentenced to six years in prison at Green Correctional Facility in Coxsackie, New York.

57. Prior to the shooting, Daniel was a good student and an N.C.A.A. Division I college basketball prospect.

58. The shooting and Daniel's ongoing recovery substantially harmed his chances of continuing his basketball career beyond high school.

-10-

**B.**     The Negligent Distribution and Sale of the Hi-Point Handgun Caused Plaintiff's Injuries by Arming the Shooter.

59.    Defendants negligently distributed and sold the Hi-Point handgun in a manner that caused it to be obtained by Caldwell, an illegal and malicious gun user and possessor, and then to be used to shoot Daniel Williams. Caldwell was able to obtain the handgun, and cause Daniel's injury, only through the recklessness and/or negligence of a series of handgun sellers and purchasers.

60.    Defendants Beemiller, Inc.; MKS Supply, Inc.; and Charles Brown are engaged in the business of selling handguns.

61.    Defendant gun sellers are well aware of the substantial risk that criminals will obtain those guns, often through gun traffickers, straw purchasers, and/or irresponsible dealers with irresponsible sales practices.

62.    Defendant gun sellers knew or should have known that unless they used reasonable care in the sale and distribution of handguns, criminals and/or illegal handgun traffickers, such as Defendant Bostic, and illegal and criminal users, such as Caldwell, would obtain handguns, as

-11-

occurred here, and that tragic shootings, such as Daniel Williams's, would foreseeably result.

63.   Defendant gun sellers owed foreseeable victims, including Daniel Williams, a duty to use reasonable care in the gun sellers' sale and distribution of the Hi-Point handgun; defendant gun sellers breached that duty by failing to exercise reasonable care in their sale and distribution of the Hi-Point handgun, and their negligence caused the shooting of Daniel Williams.

64.   Defendant gun sellers intentionally chose to distribute and sell the Hi-Point gun – a "Saturday Night Special," which law enforcement has found is used disproportionately by criminals and juveniles – through dangerous, high-risk, unreasonable, and irresponsible sales practices, and a dangerous, high-risk, unreasonable, irresponsible dealer, in order to profit off the criminal gun market.  This conduct was undertaken at the expense of innocent persons who would be foreseeably injured or killed as a result of their negligence, including children such as Daniel Williams.

(1)     **The special relationship between Beemiller, Inc.; MKS Supply, Inc.; and Charles Brown.**

65.     Defendant Charles Brown is President of MKS Supply, Inc.

66.     MKS Supply, Inc. is a firearms wholesaler operating in Dayton, Ohio.

67.     MKS Supply, Inc. has two full-time employees.

68.     Brown performs much of the day-to-day operations of MKS Supply, Inc.

69.     Brown also makes business decisions for MKS Supply, Inc.

70.     Before becoming President of MKS Supply, Inc. in 2003, Brown was vice president and executive vice-president for approximately ten years.

71.     MKS Supply, Inc. is the sole marketer and distributor of Hi-Point firearms.

72.     MKS Supply, Inc. does not distribute or sell any other brands of firearms.

73.     In addition to owning and operating MKS Supply, Inc., Charles Brown also has an individual federal firearms license which he uses to sell handguns to individual consumers.

74.  Brown supplies his personal firearms business with handguns from MKS Supply, Inc.'s inventory.

75.  Brown sold firearms from MKS Supply, Inc.'s inventory at gun shows in Dayton, Ohio.

76.  Hi-Point 9mm firearms, including the firearm at issue here, are manufactured by Beemiller, Inc.

77.  Beemiller, Inc. is owned and operated by Thomas Deeb.

78.  Beemiller, Inc. uses a work force of approximately two dozen employees to manufacture the Hi-Point 9mm and other firearms the company sells.

79.  Deeb is in personal contact with Brown on an almost daily basis.

80.  Deeb visits MKS Supply, Inc. approximately 6 times a year.

81.  Beemiller, Inc. does not have a written contract governing its business relationship with MKS Supply, Inc.

82.  MKS Supply, Inc. operates Beemiller, Inc.'s website at: www.Hi-PointFirearms.com.

(2)     **The suspicious circumstances of the sale of the Hi-Point handgun by Brown to Upshaw and Bostic should have alerted Brown that the Hi-Point handgun was intended for the criminal market.**

83.   The Hi-Point 9mm semi-automatic firearm used in the Williams shooting bore serial number 502139 and was manufactured by Beemiller, Inc.

84.   The Hi-Point handgun was distributed by MKS Supply, Inc. to Charles Brown.

85.   The Hi-Point handgun was purchased from Charles Brown by Kimberly Upshaw.

86.   Upshaw purchased the Hi-Point handgun for James Nigel Bostic on or around October 1, 2000.

87.   The Hi-Point handgun was one of at least 140 handguns guns that Charles Brown sold to Bostic and/or Upshaw.

88.   On or about October 1, 2000, Charles Brown sold 87 handguns to Kimberly Upshaw.

89.   Included in that grouping of 87 handguns was the Hi-Point handgun.

90.   The Hi-Point 9mm firearm line is disproportionately used in crime.

91.   Hi-Point 9mm firearms have no collector value or interest.

92. Prior to Brown's sale of 87 handguns to Upshaw on or around October 1, 2000, Brown sold Bostic and/or his straw purchaser dozens of others handguns, as follows:

| | |
|---|---|
| May 28, 2000<br>Sale to Bostic | 9 handguns |
| June 28, 2000<br>Sale to Upshaw for<br>Bostic | 8 handguns |
| September 2000<br>Sale to Upshaw for<br>Bostic | approximately<br>40 handguns |
| October 1, 2000<br>Sale to Upshaw for<br>Bostic | 87 handguns |

93. The sale of the Hi-Point handgun was suspicious in several respects, including but not limited to the fact that Bostic had purchased multiple guns before, that Upshaw had purchased multiple guns before for Bostic, and other indicia of an illegal "straw purchase" (where an illegal or otherwise prohibited buyer uses another person, the "straw purchaser," to acquire one or more handguns from a licensed handguns dealer), the fact that it was part of an extremely large multiple sale (a sale of multiple handguns in one transaction), and was paid for in cash.

94. On or around October 1, 2000, Bostic and Upshaw approached Brown at the Goodman Gun Show.

-16-

95.   Bostic selected 87 handguns to purchase.

96.   Bostic paid for the guns in cash on each occasion.

97.   Upshaw filled out the paperwork as the purchaser of record.

98.   These circumstances present well-known indicators of a straw purchase that would suggest to a reasonable person in the same or similar circumstances that an illegal straw purchase was taking place.

99.   These indicators revealed that Upshaw was making illegal straw purchases on behalf of Bostic, who was illegally trafficking guns.

100.   On each of the three sales to Bostic and Upshaw prior to October 1, 2000, Bostic accompanied Upshaw when Upshaw made the purchases from Brown.

101.   Bostic selected the guns on each occasion.

102.   Bostic paid for the guns in cash.

103.   These indicators revealed that Upshaw was making illegal "straw purchases" on behalf of Bostic.

104.   Bostic was illegally trafficking guns.

105.   The sale of the Hi-Point handgun was part of a multiple sale.

-17-

106.   A reasonable person would have realized that Upshaw and/or Bostic were not purchasing 87 handguns for their personal use, especially given the prior multiple sales to Bostic and Upshaw, and given the selection of the Hi-Point gun.

107.   A reasonable person would have realized that Bostic and/or Upshaw instead intended to sell these multiple guns on the criminal handgun market, to supply prohibited persons and criminals such as Caldwell with handguns.

108.   The Hi-Point handgun was paid for entirely in cash.

109.   The multiple sales totaled several thousand dollars.

110.   All the purchases were paid for entirely in cash.

111.   The cumulative circumstances suggest to a reasonable person that the purchaser had illegal intent.

112.   A "short time-to-crime" (the time between the sale of the handgun and when it is used or recovered in crime) is, according to the ATF, an indicator that the handgun was likely trafficked.  A time-to-crime of three and a half years is considered short.

113.   In this case, the time-to-crime was 2 years and 10 months.

114.   As Charles Brown knew or should have known when he sold the Hi-Point handgun, Upshaw was not buying these guns for her personal use or collection, but rather was buying handguns for illegal trade and/or resale to convicted criminals or other persons with criminal intent.

115.   Brown knew or should have known when he sold these handguns that the ultimate users of these guns would be persons who could not purchase handguns legally at retail stores or did not want to do so in order to avoid a paper trail connecting them to the handgun.

116.   At least one of the guns sold by Charles Brown to Upshaw, the Hi-Point handgun, was trafficked and then illegally obtained by Cornell Caldwell, an illegal and malicious possessor, and then used to shoot and injure Daniel.

(3)   **Beemiller, Inc.; MKS Supply, Inc.; and Charles Brown should have taken reasonable care to prevent sales of handguns to illegal users.**

117.   Defendant gun sellers knew or should have known that unless they used reasonable care in the sale and distribution of handguns, criminals and handgun traffickers

-19-

who supply criminals, such as Caldwell and Bostic, would obtain handguns and use them to cause injury or death.

118.   Defendants gun sellers knew or should have known that unless they used reasonable care to prevent multiple sales of handguns (that is, sales of multiple handguns to individual purchasers over a limited period of time) and to prevent straw purchases of handguns, criminals and handgun traffickers who supply criminals, such as Caldwell and Defendant Bostic, would obtain handguns and use them to cause injury.

119.   Defendants knew or should have known that the vast majority of firearms used to commit crimes in Buffalo, as throughout the country, are purchased from licensed dealers and diverted to the criminal market through trafficking schemes.

120.   Some gun dealers not only participate in these illegal transactions in circumstances where they know or should know the straw buyer is not the gun's true purchaser, but even suggest and encourage such transactions to avoid losing sales.

121.   Some gun dealers also make multiple sales or repeated sales to one customer, even though such a pattern of purchases may indicate that the purchaser is a gun

trafficker who will transfer the guns to prohibited purchasers via the unlawful market.

122.   Some gun dealers make sales without following all federal and state legal requirements such as obtaining proper identification of purchasers, conducting background checks, and imposing waiting periods on purchasers.

123.   Some gun dealers conveniently "look the other way" while sales are made under circumstances where the dealer knows or should know the gun will thereafter be diverted into the illegal market.

124.   Convicted criminals, drug users, and drug dealers, and other persons with criminal intent who cannot purchase guns legally at retail stores, or who do not want to do so in order to avoid a paper trail connecting them to the gun, use straw purchasers and/or purchase guns from gun traffickers in the manner that the Hi-Point handgun was purchased here.

125.   Defendant gun sellers knew or should have known that certain factual scenarios indicate that a prospective purchaser may intend to supply handguns to the criminal handgun market.

-21-

126.    Those scenarios include, but are not limited to:

        a.    Multiple sales of handguns;

        b.    Large cash transactions; and

        c.    Facts suggesting a straw purchase, such as where one person is selecting a handgun or handguns for multiple persons, or one person appears to be selecting a handgun or handguns and another person pays for them.

127.    In reports, of which defendant gun sellers knew or should have known, the ATF and others have stated that multiple sales and straw purchases are used by criminals and handgun traffickers to obtain handguns.

128.    Reports and studies, including those issued by the federal government of which defendant gun sellers were on notice, had made these facts clear for many years.

129.    Nonetheless, defendant gun sellers took no reasonable steps to alter their distribution and sales practices to minimize the risk that they would supply the criminal market.

130.    Further, defendant gun sellers had been informed by law enforcement when they sold individual guns that were traced to crime.

131.    In fact, each time Charles Brown sold a gun that was recovered in connection with a crime, Charles Brown

-22-

received specific notice by a telephone call or fax from the ATF.

132.   When law enforcement recovers a handgun in connection with a crime, they trace that handgun through the ATF.

133.   ATF starts a trace by calling the handgun's manufacturer, providing the handgun's serial number, and asking the manufacturer to identify the distributor to whom it sold the handgun.

134.   ATF then contacts that distributor and asks it to identify the distributor or dealer to whom it sold the handgun.

135.   ATF proceeds in that manner, through the distribution chain, until reaching the dealer who made the retail sale of the handgun.

136.   That dealer identifies to ATF the individual customer to whom it sold the handgun.

137.   Charles Brown thus received specific notice by a telephone call from ATF every time police successfully traced one of the guns he or his company sold to crime.

138.   Brown's company, MKS Sales, Inc., was put on notice thousands of times between 1988 and 2000 that it had sold guns used in crime.

-23-

139. Successfully traced guns represent only a fraction of the total number of guns used in crime.

140. Beemiller, Inc. and MKS Supply, Inc. also received notice by a call from ATF every time police traced one of the guns they sold to crime.

141. Beemiller, Inc. and MKS Supply, Inc. sold over 13,000 guns traced to crime from 1988 to 2000.

142. Beemiller, Inc. and MKS Supply, Inc. were therefore on notice thousands of times that they and the dealers they utilized had sold guns used in crime.

143. Beemiller, Inc. and MKS Supply, Inc. could have obtained from Charles Brown notice of all traces for all crime guns sold by Charles Brown.

144. Nonetheless, defendant gun sellers took no reasonable steps to alter their distribution and sales practices to minimize the risk that they would continue to supply the criminal market.

145. Because ATF recognizes that multiple sales are suspicious transactions that are known to supply the criminal handgun market, handgun dealers are also required to notify ATF of any multiple sale of handguns by completing a form which is to be sent to ATF and appropriate local or state law enforcement.

-24-

146.   Most handgun dealers do not engage in any multiple sales.

147.   Only a relatively small percentage of handgun dealers engage in any multiple sales, and an even smaller percentage engage in several multiple sales.

148.   Brown is among the small minority of dealers who engage in many multiple sales.

149.   Nonetheless, defendant gun sellers took no reasonable steps to alter their distribution and sales practices to minimize the risk that their handguns would be sold in high-risk multiple sales.

150.   Beemiller, Inc. manufactures and sells guns commonly known "Saturday Night Specials" or "junk guns."

151.   These are cheap, low quality, easily concealable guns that are disproportionately used by criminals and widely recognized as having little or no legitimate value or utility.

152.   The Hi-Point handgun is a Saturday Night Special.

153.   Defendant gun sellers are on notice that Saturday Night Specials, such as the Hi-Point handgun used to injure Daniel, are not sought after by collectors,

-25-

hunters, or law enforcement, and are commonly used by criminals and juveniles.

154.   As a result of their small size and low quality, many Hi-Point handguns would fail the "sporting purposes" test that the federal government applies to imported, but not domestically produced, handguns in the Gun Control Act of 1968.  See 18 U.S.C. § 925.

155.   Several states and cities have outlawed certain models of Hi-Point handguns.

156.   In 2000, the Hi-Point 9mm semi-automatic pistol was the most popular pistol used in crimes in Buffalo, New York.  See Bureau of Alcohol, Tobacco and Firearms, Youth Crime Gun Interdiction Initiative, Crime Gun Trace Reports: Buffalo (2000).

157.   Thus, three years prior to the shooting of Daniel Williams, the defendant gun sellers were on notice from the ATF that Hi-Point 9mm semi-automatic pistols were the gun of choice for criminals in Buffalo.

158.   Nonetheless, defendant gun sellers took no reasonable steps to alter their distribution and sales practices to minimize the risk that handguns which are disproportionately sought after by criminals would be sold into the criminal market.

159. Defendant gun sellers also took no reasonable steps to make the Hi-Point 9mm semi-automatic pistol unavailable to criminals in Buffalo.

160. Instead, they continued to make the Hi-Point 9mm semi-automatic pistol easily accessible to criminals.

161. Defendant gun sellers knew or should have known that their sales and distribution practices were supplying handguns to gun traffickers and/or the criminal handgun market.

162. Defendant gun sellers have long been on notice that their distribution practices facilitate supply of guns to the illegal secondary and criminal market.

163. For example, the United States Department of Justice recognized in a major report entitled <u>Handgun Violence Reduction: National Integrated Handguns Violence Reduction Strategy</u> (hereinafter "<u>DOJ Report</u>") that defendant gun sellers' business practices cause criminal handgun acquisition.

164. The Justice Department called on Beemiller, Inc. and other handgun manufacturers to self-police their distribution chain, stating they could substantially reduce

the illegal supply of handguns by instituting controls on

their chain of distribution.  The Justice Department stated:

> The handguns industry can make a
> significant contribution to public
> safety by adopting measures to police
> its own distribution chain.  In many
> industries, such as the fertilizer and
> explosives industries, manufacturers
> impose extensive controls on their
> dealers and distributors.  Handgun
> manufacturers and importers could
> substantially reduce the illegal supply
> of handguns by taking similar steps to
> control the distribution of handguns.
> To properly control the distribution of
> handguns, handgun manufacturers and
> importers should: identify and refuse to
> supply dealers and distributors that
> have a pattern of selling handguns to
> criminals and straw purchasers; develop
> a continual training program for dealers
> and distributors covering compliance
> with handguns laws, identifying straw
> purchase scenarios and securing
> inventory; and develop a code of conduct
> for dealers and distributors, requiring
> them to implement inventory, store
> security, policy and record keeping
> measures to keep handguns out of the
> wrong hands, including policies to
> postpone all handgun transfers until
> NICS [National Instant Criminal
> Background Check System] checks are
> completed.

Id.

165.  The Justice Department went on to explain

that the ATF, the Treasury Department, and the Justice

Department would encourage and assist defendant gun sellers,

and the rest of the handgun industry, to prevent criminal

-28-

acquisition of handguns, including "to encourage voluntary measures, such as a code of conduct and comprehensive training for dealers, to ensure that handguns are not stolen or sold to criminals or straw purchasers." Id.

166. Despite these strong recommendations and offers of assistance that would alter defendant gun sellers' practices that result in criminal acquisition of handguns, defendant gun sellers implemented none of these steps.

167. The gun industry itself has also recognized that the sales practices employed by Brown are not reasonably adequate to prevent the diversion of guns to the criminal gun market. The industry's trade association, the National Shooting Sports Foundation ("NSSF"), with the assistance of the ATF, has issued a recommended sales protocol under which gun dealers should screen suspicious purchasers with a battery of questions, beyond those required by federal law, and not sell firearms to a person unless the dealer has no doubts about the legitimacy of the sale, even if the purchaser is not prohibited by federal or state law from buying guns.

168.  This program recommends that retailers establish the following minimal procedures in a basic attempt to prevent straw purchases:

      a.    To simply have your customer fill out the required forms and undergo the criminal background check may not be enough under certain circumstances. . . .  By including a couple questions regarding the identity of the actual purchaser in this pre-sales screening, retailers can provide a valuable service to law enforcement and to their community without offending a legitimate customer.

      b.    An effective way to do this is to establish a store policy that every potential handgun purchaser will be asked the same sequence of questions. You may even want to post a sign in your store that informs the customer of this policy.  The sign may read:  To assist law enforcement it is our policy to go beyond the law in verifying the identity of the actual purchaser of a handgun.

      c.    Questions for All Purchasers You Do Not Personally Know:  1.  Is the handgun for you or someone else?  2.  If someone else, is this a gift?  3.  What is the intended use: personal protection, deer hunting, target shooting?  4.  What type of handgun are you interested in or most comfortable with? . . .

      d.    If suspicions arise, it is more prudent to follow the precautionary principle of politely refusing the sale to protect yourself from the risk of contributing to a possible illegal transaction.

169.   Defendant gun sellers' failure to exercise reasonable care in their sales of handguns, failure to require that handgun sellers follow "Don't Lie for The Other Guy," or a similar program, or a more rigorous program, and failure to require that a sale not be completed where there was doubt as to whether the purchaser was a straw purchaser or otherwise intended to transfer the purchased handgun to another person, or to use it in crime, proximately caused the injuries suffered by Daniel Williams.

170.   Beemiller, Inc. and MKS Supply, Inc. knew or should have known that Brown was engaging in negligent and reckless conduct which supplied handguns to illegal gun traffickers and illegal gun users.

171.   However, while the risk of continuing to supply Charles Brown without reasonable conditions, monitoring, or supervision was well known and reasonably foreseeable to Beemiller, Inc. and MKS Supply, Inc., they chose not to impose reasonable conditions, monitoring, or supervision, or to cut off supply to Charles Brown.

172.   Beemiller, Inc. and MKS Supply, Inc. also chose not to take other reasonable steps that would reduce the flow of guns to illegal traffickers and illegal gun users.   Instead, they relied upon and exploited Charles

-31-

Brown's dangerous sales practices and the illegal secondary market as a source of profit.

173. Beemiller, Inc. controls sales to its distributors and dealers by choosing with which distributors to do business.

174. Beemiller, Inc. has the power and discretion to alter the terms of their relationship with distributors or to seek or establish alternative distribution channels.

175. Such decisions are made for the financial benefit of Beemiller, Inc.

176. Beemiller, Inc. chooses to allow MKS Supply, Inc. to sell to any dealer, and to Charles Brown in particular, even if they have notice of the high-risk and unreasonable sales practices of those dealers -- and Charles Brown in particular -- because sales to the crime gun market are profitable for Beemiller, Inc. and MKS Supply, Inc.

177. Beemiller, Inc. and MKS Supply, Inc. could have, through means within their control, acted to prevent guns they distributed and sold, including the Hi-Point handgun, from being sold to an illegal gun trafficker and into the illegal market and the hands of unauthorized and irresponsible persons.

178.  For example, Beemiller, Inc. and MKS Supply, Inc. could have taken any of the following reasonable steps:

a.  adequately investigated or screened the distributors and dealers through which they distributed and sold Hi-Point guns;

b.  adequately monitored, supervised, regulated, and standardized distributors' and dealers' methods of distributing and selling Hi-Point guns;

c.  established a direct distribution system in which Beemiller, Inc. sold directly to dealers or through their own wholly-owned dealers;

d.  adequately trained and required distributors and dealers to act lawfully and responsibly to ensure compliance with federal, state, and local laws;

e.  directed distributors and dealers to refuse to sell firearms under circumstances where the seller knows or should know that the guns will likely not be used for the purchaser's personal use or otherwise will likely not be used for legal purposes, including "multiple sales" or repeated sales to individuals who purchase guns under unexplained or suspicious circumstances;

f.  required their distributors and dealers to maintain records of trace requests initiated by law enforcement agencies, and to report to them about those trace requests, allowing Beemiller, Inc. and MKS Supply, Inc. to track and analyze where and when in the chain of distribution guns have been diverted to crime, and to take preventive measures to reduce such diversions; and

-33-

g.   instituted effective monitoring and sanctions to enforce these requirements, including terminating or otherwise effectively disciplining distributors and dealers whom they know or should know distribute firearms into the unlawful market or in an illegal or unsafe manner.

179.   Rather than implement such responsible measures, Beemiller, Inc. and MKS Supply, Inc. intentionally supplied Hi-Point guns to irresponsible dealers, including Brown, who continually supplied the criminal gun market so long as the dealer met the bare minimum legal requirement -- possession of a federal firearms license ("FFL") -- which almost anyone at least 21 years old who does not have a criminal felony record can easily obtain.

180.   Beemiller, Inc. and MKS Supply, Inc. knew or should have known that compliance with the minimum legal requirement of selling to FFL holders, without any of the other reasonable steps they could take to ensure safe distribution, would result in the supply of guns to irresponsible gun sellers such as Brown, and that, as a result, innocent persons such as Daniel Williams would be injured as a result.  Beemiller, Inc. and MKS Supply, Inc. consciously disregarded the risk posed by supplying Charles Brown with firearms without any reasonable conditions, standards, or monitoring.

-34-

181.   Defendants' failure to exercise reasonable care in their sales of handguns, and failure to require that they not complete a sale where there was doubt as to whether the purchaser was a straw purchaser or otherwise intended to transfer the purchased handgun to another person, or to use it in crime, proximately caused the injury of Daniel Williams.

182.   The provisions of CPLR Article 16 do not apply in this case, or an Article 16 exemption or exemptions will apply.

### Count 1
### (Negligent Distribution and Sale)

183.   Plaintiffs hereby incorporate all previous paragraphs.

184.   At all relevant times, defendants were subject to the general duty imposed on all persons not to expose others to reasonably foreseeable risks of injury.

185.   Defendants therefore had a duty to exercise reasonable care in distributing and selling guns and to refrain from engaging in any affirmative activity creating reasonably foreseeable risks of injury to others.

186.   Beemiller, Inc. and MKS Supply, Inc. breached their duty not to expose others to reasonably

-35-

foreseeable risks of injury by negligently distributing guns, including the Hi-Point handgun, by utilizing irresponsible dealers such as Charles Brown and irresponsible business practices such as those employed by Charles Brown.

187. Beemiller, Inc. and MKS Supply, Inc. utilized a distribution system that they knew was likely to and did divert a large number of guns, including the Hi-Point handgun, to criminals, juveniles, and other persons prohibited by law from having guns and/or persons with criminal purposes, and without taking reasonable precautions to ensure the safety of distribution of its products and to prevent guns, including the Hi-Point handgun, from flowing to irresponsible gun dealers, illegal gun traffickers, the illegitimate market, and illegal and irresponsible gun users.

188. Beemiller, Inc. and MKS Supply, Inc. knew or should have known that innocent persons such as Daniel Williams would be injured as a result.

189. Charles Brown breached his duty not to expose others to reasonably foreseeable risks of injury by negligently selling guns, including the Hi-Point handgun, to a person that Charles Brown knew or should have known was

-36-

illegally engaged in the business of dealing handguns
without a licensed and who was making illegal straw
purchases on behalf of persons prohibited by law from
possessing or purchasing handguns, and/or persons with
criminal purposes.

190.   Brown knew or should have known that
innocent persons such as Daniel would be injured as a
result.

191.   International Gun-A-Rama breached its duty
not to expose others to reasonably foreseeable risks of
injury by negligently allowing Charles Brown to sell
firearms, including the Hi-Point handgun, at the Hara Arena,
when it knew or should have known that Brown was selling
guns to illegal straw purchasers or traffickers, and that
innocent persons such as Daniel would be injured as a
result.

192.   James Bostic and Kimberly Upshaw breached
their duty not to expose others to reasonably foreseeable
risks of injury by negligently and illegally engaging in the
business of dealing guns, including the Hi-Point handgun,
without a license, by making illegal "straw purchases" on
behalf of persons prohibited by law from possessing or
purchasing guns and/or persons with criminal purposes,

-37-

and/or by illegally trading or re-selling guns to such persons.

193.   Bostic and Upshaw knew or should have known that innocent persons such as Daniel would be injured as a result.

194.   John Doe Traffickers breached their duty not to expose others to reasonably foreseeable risks of injury by negligently and illegally engaging in the business of dealing guns, including the Hi-Point handgun, without a license, and/or illegally trading or re-selling guns to such persons.

195.   John Doe Traffickers knew or should have known that innocent persons such as Daniel would be injured as a result.

196.   Defendants' breaches of the duty not to expose others to reasonably foreseeable risk of injury were direct, legal, and proximate causes of, and substantial factors in, causing the shooting of Daniel Williams and all the injuries to him.

197.   The amount of damages sought in this cause of action exceeds the jurisdictional limits of all lower courts which would otherwise have jurisdiction, and

plaintiffs will seek damages in an amount to be proven and determined at the trial of this action.

### Count 2
### (Negligent Entrustment)

198.   Plaintiffs hereby incorporate all previous paragraphs.

199.   Charles Brown negligently permitted Kimberly Upshaw and James Bostic to acquire possession of the Hi-Point handgun, when he knew or should have known that they intended or were likely to use the Hi-Point handgun, or to engage in activity, in such a manner as to create an unreasonable risk of harm to others.   Such activity included engaging in illegal gun trafficking and illegally re-selling or trading the Hi-Point handgun to someone prohibited by law from having the gun.

200.   Brown knew or should have known that Upshaw and/or Bostic intended or were likely to engage in such activity.

201.   The Hi-Point handgun was under the control of Brown at the time he negligently permitted Upshaw and Bostic to acquire possession of the handgun.

202.   Upshaw became entitled to possess and use the Hi-Point handgun only by the consent of Brown, and

-39-

Bostic became entitled to possess and use the Hi-Point handgun only by the negligence of Brown and the consent of Upshaw.

203.   Brown knew that by withholding consent he could prevent Upshaw and Bostic from possessing or using the Hi-Point handgun.

204.   It was reasonably foreseeable to Brown, and he knew or had reason to know based on the circumstances surrounding the sale and notice to Brown, that Upshaw was not buying the Hi-Point handgun for her personal use and that she would transfer it to someone prohibited by law from having the gun.

205.   Criminal use of a gun by such a person, such as shooting an innocent teenager, is a reasonably foreseeable result of the supply of guns to such a person.

206.   Brown's negligent provision of the Hi-Point handgun to Upshaw and Bostic was a direct and proximate cause of the shooting of Daniel and the injuries alleged herein.

207.   The amount of damages sought in this cause of action exceeds the jurisdictional limits of all lower courts which would otherwise have jurisdiction, and

plaintiffs will seek damages in an amount to be proven and determined at the trial of this action.

### Count 3
### (Negligence Per Se)

208.   Plaintiff hereby incorporates all previous paragraphs.

209.   James Nigel Bostic and Kimberly Upshaw violated federal, state, and local statutes, regulations, and ordinances by engaging in illegal gun trafficking and illegally buying and selling or trading the Hi-Point handgun.

210.   Bostic's and Upshaw's violations of laws were a direct and proximate cause of the shooting of Daniel and the injuries alleged herein.  These laws are intended to protect public safety by preventing unlicensed and dangerous dealing of guns and acquisition and misuse of guns by criminals, children, and other irresponsible individuals. Bostic's and Upshaw's violations caused harm of the kind the laws were intended to avoid, and Daniel was within the class of persons the laws were intended to protect.

211.   Cornell Caldwell violated federal, state, and local statutes, regulations, and ordinances by engaging

in illegal gun trafficking and illegally buying or trading the Hi-Point handgun.

212.   Caldwell's violations of laws were a direct and proximate cause of the shooting of Daniel and the injuries alleged herein.   These laws are intended to protect public safety by preventing unlicensed and dangerous dealing of guns and acquisition and misuse of guns by criminals, children, and other irresponsible individuals.   Caldwell's violations caused harm of the kind the laws were intended to avoid, and Daniel was within the class of persons the laws were intended to protect.

213.   The amount of damages sought in this cause of action exceeds the jurisdictional limits of all lower courts which would otherwise have jurisdiction, and plaintiffs will seek damages in an amount to be proven and determined at the trial of this action.


### Count 4
### (Public Nuisance)

214.   Plaintiffs hereby incorporate all previous paragraphs.

215.   By distributing and selling guns in a manner that ensures a steady flow of guns in large quantities to

illegal traffickers, the illegal secondary market,
criminals, juveniles, and others prohibited by law from
having guns and/or persons with criminal purposes,
defendants have knowingly participated in creating and
maintaining an unreasonable interference with rights common
to the general public which constitutes a public nuisance
under New York law.

216.   Defendants negligently, recklessly, and
intentionally engaged in this conduct.

217.   Defendants' interference with rights common
to the public, including public health, safety, comfort, and
peace, is unreasonable.  This interference is not
insubstantial or fleeting, and involves deaths and serious
injuries suffered by many people and a severe disruption of
public peace, order, and safety.  This interference is
continuing, producing a permanent and long-lasting effect.

218.   Defendants know or have reason to know that
their conduct has a significant effect upon public rights
and interests.

219.   Defendants' conduct in participating in
creating and maintaining this interference with public
rights facilitates the widespread violation of federal and
New York laws restricting and regulating gun sales and

possession, or facilitates the circumvention and violation of such laws.

220.   Defendants Beemiller, Inc. and MKS Supply, Inc. had the ability to impose conditions on and to exercise control over the conduct of every entity in the chain of distribution through which products they sold reached the public.

221.   Defendant Brown exercised control over his sale of guns to illegal gun traffickers, straw purchasers, and other persons providing guns to the illegal market, illegal traffickers, and illegal users.

222.   Defendants Upshaw, Bostic, and John Doe Traffickers exercised control over their illegal gun trafficking activities and sales of guns including the Hi-Point handgun.

223.   The conduct of defendants contributed to the creation or maintenance of the public nuisance.

224.   Defendants were each capable of preventing their contribution to the public nuisance and the resulting danger and harm by altering their conduct.

225.   As a result of defendants' conduct and the public nuisance they participated in creating and maintaining, Daniel suffered special injuries

-44-

distinguishable from that suffered by the general public.
Defendants' participation in creating and maintaining the
public nuisance were direct, legal, and proximate causes and
substantial factors causing those injuries.

226.  The amount of damages sought in this cause
of action exceeds the jurisdictional limits of all lower
courts which would otherwise have jurisdiction, and
plaintiffs will seek damages in an amount to be proven and
determined at the trial of this action.

## Count 5
### (Derivative Claim)

227.  Plaintiffs hereby incorporate all previous
paragraphs.

228.  Plaintiff Edward Williams is the parent and
natural guardian of plaintiff Daniel Williams, who was an
infant at the time of the conduct that is the subject of
this lawsuit.

229.  As a result of the negligence, culpable
conduct, and liability of the defendants as set forth above,
plaintiff Edward Williams has been damaged through the loss
of his child's affection, services, and support as a result
of the injuries sustained by then-infant plaintiff Daniel

Williams, and have incurred or may become liable for expenses relating to the medical, hospital, psychological, rehabilitation and educational needs of the then-infant plaintiff, all to his damage.

230.   The amount of damages sought in this cause of action exceeds the jurisdictional limits of all lower courts which would otherwise have jurisdiction, and plaintiffs will seek damages in an amount to be proven and determined at the trial of this action.

### Relief Requested

WHEREFORE, plaintiffs DANIEL WILLIAMS and EDWARD WILLIAMS demand judgment against defendants, as follows: (a) as and for the five causes of action, in an amount to be proven at trial, together with the costs and disbursements of this action and for other and further relief as this court may deem just and proper; (b) punitive damages based on defendants' outrageous, intentional, and reckless conduct; (c) reasonable counsel fees and costs; and (d) such other and further relief as the Court may deem appropriate.

DATED:     Buffalo, New York
           July 28, 2005

                              *Terence Connors*

                              Terrence M. Connors
                              CONNORS & VILARDO, LLP
                              Attorneys for Plaintiffs
                              1020 Liberty Building,
                              420 Main Street
                              Buffalo, New York  14202
                              (716) 852-5533

                              Pending Admission *Pro Hac Vice*:
                              Dennis A. Henigan
                              Jonathan E. Lowy
                              Brian J. Siebel #2380186
                              Elizabeth S. Haile
                              BRADY CENTER TO PREVENT GUN
                                VIOLENCE LEGAL ACTION PROJECT
                              1225 Eye Street, N.W.
                              Suite 1100
                              Washington, D.C.   20005
                              (202) 289-7319

-47-